# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| Prime Steakhouse, on behalf of itself and all others similarly situated,<br><br>  *Plaintiff,*<br><br>v.<br><br>Mowi ASA (fka Marine Harvest ASA), Marine Harvest USA, LLC, Marine Harvest Canada, Inc., Ducktrap River of Maine LLC, Grieg Seafood ASA, Grieg Seafood BC Ltd., Bremnes Seashore AS, Ocean Quality AS, Ocean Quality North America Inc., Ocean Quality USA Inc., Ocean Quality Premium Brands, Inc., SalMar ASA, Leroy Seafood Group ASA, Leroy Seafood USA Inc., and Scottish Sea Farms Ltd.<br><br>  *Defendants.* | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ........................................................................................... 3

JURISDICTION AND VENUE ............................................................................. 5

PLAINTIFF ........................................................................................................... 6

DEFENDANTS ..................................................................................................... 6

AGENTS AND CO-CONSPIRATORS ............................................................... 12

FACTUAL ALLEGATIONS ............................................................................... 12

A.     The European Commission Is Investigating Unexplained Price Increases
       In The Salmon Market ............................................................................. 12

B.     The United States Is A Substantial Market For Farm-Raised Salmon ................. 20

C.     The Production Process For Farm-Raised Salmon ............................................. 21

D.     The Structure And Characteristics Of The Market For Farm-Raised
       Salmon Supports The Existence Of A Conspiracy ............................................. 23

       1.     Barriers To New Entry Are High ................................................. 23

       2.     Farm-Raised Salmon Is A Commodity Product And Prices Are
              Correlated Across the Globe ........................................................ 26

       3.     Norwegian Companies Dominate The Production Of Farm-Raised
              Salmon And The Defendants Are The Largest Global Producers ........... 30

       4.     Atlantic Salmon Production Is Highly Inelastic And The Product Is
              Perishable .................................................................................. 32

       5.     Industry Concentration Facilitates Collusion ................................. 33

CLASS ACTION ALLEGATIONS ..................................................................... 34

INTERSTATE TRADE AND COMMERCE ....................................................... 39

PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY ...................... 39

CAUSES OF ACTION ........................................................................................ 40

i

PRAYER FOR RELIEF ...................................................................................................... 72

JURY DEMAND ............................................................................................................... 74

Plaintiff Prime Steakhouse ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to various federal and state antitrust laws and state unfair competition laws and unjust enrichment laws, demands a trial by jury, and alleges as follows:

## NATURE OF ACTION

1.      This lawsuit arises from unlawful coordination of the price of farm-raised salmon and salmon products derived therefrom which were sold by Mowi ASA (f/k/a Marine Harvest ASA), Marine Harvest USA, LLC, Marine Harvest Canada, Inc., Ducktrap River of Maine LLC, Grieg Seafood ASA, Grieg Seafood BC Ltd., Bremnes Seashore AS, Ocean Quality AS, Ocean Quality North America Inc., Ocean Quality USA Inc., Ocean Quality Premium Brands, Inc., SalMar ASA, Leroy Seafood Group ASA, Leroy Seafood USA Inc., and Scottish Sea Farms Ltd. and/or entities owned or controlled by them (collectively, "Defendants") between July 1, 2015 and the present in violation of federal antitrust law and various state antitrust and unfair competition, consumer protection and unfair trade practices, and unjust enrichment laws.

2.      The European Commission ("EC") recently confirmed "that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon."[1]

3.      The EC commenced its investigation by sending a letter in early February 2019 to the world's dominant suppliers of farm-raised salmon and their affiliates, in which it explained that it had received information that the companies—Defendants—are "participat[ing in] or have

---

[1] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm.

participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon".[2]

4.      According to the EC, the Defendants are and have been engaging in the following conduct:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices;

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

5.      Plaintiff seeks to represent a Nationwide Class consisting of all commercial and institutional purchasers in the United States and its territories that purchased farm-raised salmon and/or products derived therefrom ("Farm-Raised Salmon"), once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of farm-raised salmon or products derived therefrom, from July 1, 2015 to the present (the "Class Period"). Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

6.      Plaintiff seeks to represent a Damages Class consisting of all commercial and institutional purchasers in the Indirect Purchaser States[3] that purchased farm-raised salmon

---

[2]  *See* https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/.

[3] The Indirect Purchaser States, for purposes of this complaint, are the states and territories for which there are claims listed in the Causes of Action section below.

and/or products derived therefrom once or more other than directly from Defendants, entities owned or controlled by Defendants, or other producers of farm-raised salmon or products derived therefrom from July 1, 2015 to the present (the "Class Period"). Excluded from the Damage Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

## JURISDICTION AND VENUE

7.      Plaintiff seeks damages, restitution, treble damages, disgorgement, other monetary relief, injunctive, and other equitable relief under federal antitrust law and various state antitrust and unfair competition, consumer protection, and unfair trade practices, and unjust enrichment laws, as alleged specifically herein, as well as costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendants' violations of those laws.

8.      This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000, there are more than 100 members in each of the Classes, and there are members of some of the Classes who are citizens of different states than Defendants. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiff is bringing an injunctive claim under federal law.

9.      Venue is appropriate in this District because one or more Defendants resided or transacted business in this District and is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.  Venue is proper in Bangor, pursuant to Rule 3(b) of the Civil Rules of the United States District Court for the District of Maine, because a substantial part of the events or omissions giving rise to the claims occurred in Waldo County.

10.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of farm-raised salmon or products derived therefrom throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

11.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## PLAINTIFF

12.     Plaintiff Prime Steakhouse is a business located at 232 West Main Street, Falconer, NY 14733. During the Class Period, Plaintiff purchased Farm-Raised Salmon, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of Farm-Raised Salmon. The Farm-Raised Salmon purchased by Plaintiff was impacted by conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

## DEFENDANTS

13.     Defendant Mowi ASA (fka Marine Harvest ASA) ("Mowi") is a Norwegian seafood company with operations in several countries around the world. The company engages in the production, processing, and sale of farmed salmon, the operations of which are focused on Norway, Scotland, British Columbia, Canada, the Faroe Islands, Ireland, and Chile. Mowi has a

share of between 25% and 30% of the global salmon and trout market, making it the world's largest company in the sector. Mowi also owns a "value added processing" unit, which prepares and distributes a range of seafood products, and a number of smaller divisions. The company is headquartered at Sandviksboder, 77AB, 5035, Bergen, Norway. Mowi is listed on the Oslo Stock Exchange, where it is a constituent of the benchmark OBX Index.

14.     Marine Harvest USA, LLC ("Marine Harvest USA") is Florida limited liability company that maintains its principal place of business at 8550 N.W. 17th Street #105, Miami, Florida 33126.  Marine Harvest USA, a wholly-owned subsidiary of Mowi, processes salmon in Florida and Texas and distributes it to wholesalers, retailers, and others in Florida and elsewhere in the United States.

15.     Marine Harvest Canada, Inc. ("Marine Harvest Canada") is a foreign corporation and wholly-owned subsidiary of Mowi. Marine Harvest Canada processes salmon in British Columbia, Canada, and distributes salmon in Canada and the western United States. Marine Harvest Canada is headquartered at 1334 Island Highway, Suite 124, Campbell River, British Columbia, V9W 8C9, Canada.

16.     Defendant Ducktrap River of Maine LLC ("Ducktrap") is a Maine limited liability company and wholly-owned subsidiary of Mowi. Ducktrap sells processed salmon products, such as sliced smoked salmon, under a number of trade names, including Ducktrap and Kendall Brook. The company has its headquarters at 57 Little River Dr., Belfast, ME 04915.

17.     Defendant Grieg Seafood ASA ("Grieg") is a foreign corporation that describes itself as "one of the world's leading fish farming companies, specializing in atlantic salmon." Grieg's "farming facilities are in Finnmark and Rogaland in Norway, British Columbia in

Canada and Shetland in the UK."[4] The company is headquartered at C. Sundtsgate 17/19, 5004, Bergen, 5004, Norway. Grieg is listed on the Oslo Stock Exchange.

18.     Defendant Grieg Seafood BC Ltd. ("Grieg BC"), a foreign corporation and wholly-owned subsidiary of Grieg, is headquartered at 1180 Ironwood Street # 106, Campbell River, British Columbia, Canada, V9W 5P7. Grieg BC farms salmon on 22 sites in British Columbia. It is the owner of Skuna Bay, a branded salmon product, that is marketed and sold throughout the United States. Indeed, in its 2018 Annual Report, Grieg states that "Skuna Bay has become the preferred salmon of choice for top chefs throughout North America . . . ."[5] It claims that its salmon has been served to the President of the United States.

19.     Defendant Bremnes Seashore AS is a foreign corporation headquartered at Oklandsvegen 90, N-5430 Bremnes, Norway ("Bremnes Seashore"). The company is in the business of salmon-farming and has operations throughout Norway. Bremnes Seashore owns 40% of Ocean Quality AS and uses that entity to sell and distribute its product around the globe, including in the United States.[6]

---

[4] *See* https://www.griegseafood.no/en/.

[5]                              *See*                              https://www.griegseafood.no/wp-content/uploads/2019/04/Grieg_Årsrapport_Børs_110419.pdf at 85.

[6] *See* https://www.seashore.no/en/production/ ("We supply salmon around the globe through our sales companies Salmon Brands and Ocean Quality. If you travel to Tokyo, Sydney, Chicago, Paris or Bangkok, you can enjoy the taste of salmon from Bremnes Seashore."); https://www.seafoodsource.com/news/supply-trade/ocean-quality-to-open-british-columbia-operations, ("Ocean Quality AS, in Bergen, Norway, is a sales company established and jointly owned by Bremnes Seashore AS (40 percent) and Grieg Seafood ASA (60 percent)."); https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 75 ("The Group owns the company Ocean Quality AS together with Bremnes Fryseri AS on a 60%/40% basis.").

20.     Defendant Ocean Quality AS ("OQ") is a foreign corporation engaged in the salmon distribution business, with its headquarters at Grieg-Gaarden, C. Sundtsgate 17/19, N-5004, Bergen, Norway. Grieg owns 60% of the outstanding shares of OQ and controls its operations.[7] Bremnes Seashore owns the remaining 40% of OQ.

21.     Defendant Ocean Quality North America Inc. ("OQ NA"), a foreign corporation and wholly owned subsidiary of OQ, is headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ NA facilitates the distribution of farm-raised salmon produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States. OQ NA has a dedicated sales office headed by General Manager Dennis Bryant, whose direct telephone number bears a Dallas, Texas area code.[8]

22.     Defendant Ocean Quality USA Inc. ("OQ USA") is a Delaware corporation and wholly-owned subsidiary of OQ, with its principal place of business located at 1914 Skillman Street #110-309, Dallas, Texas, 75206-8559. OQ USA distributes salmon products produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States.[9]

23.     Defendant Ocean Quality Premium Brands, Inc. ("OQ Premium Brands") is a Delaware corporation and wholly-owned subsidiary of OQ, headquartered at 4445 Lougheed

---

[7] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 46 ("OQ sells the fish to Asia, Europe, the USA and Canada."). *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 49.

[8] *See* https://oceanquality.com/contact/.

[9] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 75. ("Ocean Quality USA Inc is domiciled in the USA.").

Highway, 500, Burnaby, BC V5C0E4, Canada. OQ Premium Brands' business purpose, according to a December 7, 2018 filing with the California Secretary of State, is "MARKETING AND BRANDING." OQ Premium Brands distributes salmon products produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States.

24.      Defendant SalMar ASA ("SalMar") is a foreign corporation that describes itself as "one of the world's largest and most efficient producers of Atlantic salmon, and is vertically integrated along the entire value chain from broodfish, roe and smolt to harvesting, processing and sales."[10] The company is headquartered at Idustriveien 51, N-7266, Kverva, Norway. SalMar is listed on the Oslo Stock Exchange.

25.      According to SalMar's website:

SalMar has established a fully integrated system for farming, processing, sales and distribution of farmed salmon and is thus in control of the total value chain.

The salmon that SalMar is producing is sold through an in-house salesforce and/ or through close partners.

Proximity to markets and customers, direct or through partners is important to secure efficient use of a high-quality raw material that has been through a traceable and controlled production process.

InnovaMar is the name of SalMar's new harvesting and processing facility in Frøya, central Norway. It aims to be the world's most innovative and efficient facility for the landing, harvesting and processing of farmed salmon. InnovaMar covers 17,500 m$^2$ of floor space and comprises two departments (harvesting and processing). The facility has the capacity for all kinds of storage. Good internal logistics ensure safe and efficient handling of the products. The increased capacity affords a high level of flexibility with regard to organising production and sales.

---

[10] *See* SalMar 2017 Annual report, http://hugin.info/138695/R/2188425/846513.pdf, at p. 45.

SalMar produces a wide variety of fresh and frozen salmon products. The customer base is global and includes small and large importers/exporters, as well as larger processing companies and retail chains.[11]

26.     SalMar sells directly to entities within the United States:

SalMar had direct sales to around 50 different countries in 2017. SalMar's most important geographic market in 2017 was Europe, with Poland, Lithuania and Sweden as the largest individual markets. The second largest market was Asia, with Vietnam, Japan and Singapore as the largest individual markets. After sales to Russia were blocked in 2014, North America has been the third largest market, with the USA as the largest individual market. SalMar experienced particularly strong growth in the American market in 2017.[12]

27.     Defendant Leroy Seafood Group ASA ("Leroy"), a foreign corporation, is a seafood production and distribution company. The company is the second largest salmon and trout farming company in the world and has fish farms in Hitra, Kristiansund, Troms and Scotland (Shetland). The company is headquartered at Thormøhlens gate 51 B, 5006 Bergen, Norway. Leroy is listed on the Oslo Stock Exchange. The company has sales offices in the United States.

Our main office is located in Bergen, but we have fishing vessels and fish farms in operation along the entire coast of Norway. We have production and packaging plants in Norway, Sweden, Denmark, Finland, France, the Netherlands, Portugal, Spain and Turkey. We also have sales offices in the USA, Japan and China.[13]

28.     Defendant Leroy Seafood USA Inc. ("Leroy USA"), a North Carolina corporation and wholly-owned subsidiary of Leroy, is the U.S. distribution subsidiary for Leroy's farm-raised salmon business. Leroy USA's principal place of business is located at 1289 Fordham Blvd., Suite 406, Chapel Hill, NC 27514.

---

[11] *See* https://www.salmar.no/en/sales-distribution/.

[12] *See* 2017 Annual Report, http://hugin.info/138695/R/2188425/846513.pdf, at p. 53.

[13] *See* https://www.leroyseafood.com/en/about-us/about-leroy/.

29.     Defendant Scottish Sea Farms Ltd. ("Scottish Sea Farms"), a foreign corporation, is an aquaculture company that engages in the farming and production of salmon. Scottish Sea Farms is the United Kingdom's second largest producer of farmed salmon.[14] The company sells its products to retailers in the United Kingdom, the United States, Europe and internationally. Scottish Sea Farms is a joint venture of Defendants SalMar and Leroy, and each owns a 50% interest in Scottish Sea Farms. The company is headquartered at Laurel House, Laurelhill Business Park, Stirling, FK7 9JQ, United Kingdom, 01786 44552.

## AGENTS AND CO-CONSPIRATORS

30.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

31.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

32.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

**A.     The European Commission Is Investigating Unexplained Price Increases In The Salmon Market**

33.     On February 19, 2019, *Undercurrent News* reported that in early February the EC opened an antitrust investigation into the world's major producers of farm-raised salmon:

---

[14] *See* SalMar 2017 Annual report, http://hugin.info/138695/R/2188425/846513.pdf, at p. 45.

According to the letter, the EC has "received information -- from different actors operating at different levels in the salmon market -- alleging that Norwegian producers of farmed Atlantic salmon . . . participate or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon."

The letter, which was sent to producers at the start of February, states the

Norwegian producers concerned have been allegedly:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

Based on the information the EC has, these alleged practices have been going on

since "at least" November 2017 and "are presumably ongoing."[15]

34.     The EC also released the following statement on February 19, 2019:

**The European Commission can confirm that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon.**

The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union). The Commission officials were accompanied by their counterparts from the relevant national competition authorities.[16]

35.     According to an article in *Undercurrent News* dated February 19, 2019, Mowi,

Grieg, and SalMar have all confirmed that they were the subject of EC raids:

---

[15] *See* https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/.

[16] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm.

*Undercurrent* first reported the news earlier on Tuesday, then Mowi, Grieg Seafood and SalMar all confirmed raids on their operations in the UK. Mowi's spokesman said the company's plant in Rosyth, UK, was raided, but then also confirmed a plant in Lemmers, formerly Marine Harvest Sterk, was inspected.

The Sterk plant, the only one the company owns in the Netherlands, is mainly specialized on coating whitefish, but also does some salmon, according to its website.[17]

36.     In a recently released annual report for 2018, Mowi disclosed:

In February 2019, The European Commission carried out unannounced inspections at selected premises of several Norwegian salmon companies, including Mowi. The Commission was acting on concerns that the inspected companies may have violated EU antitrust rules.[18]

37.     On February 19, 2019, Grieg filed a notice with the Oslo Stock Exchange stating

as follows:

The European Commission DG (Director General) Competition has today performed an inspection at Grieg Seafood Shetland to explore potential anti-competitive behavior in the salmon industry.

Grieg Seafood aims to be open, transparent and forthcoming and will provide all necessary information requested by the European Commission DG Competition in its investigation.[19]

38.     On February 20, 2019, Leroy filed a notice with the Oslo Stock Exchange stating

as follows:

EU's competition authorities (European Commission Director General Competition) has conducted an inspection at the premises of Scottish Sea Farms Ltd.  a company owned 50% by Lerøy Seafood Group ASA (LSG). The purpose is, according to the competition authorities, to investigate accusations of anti-competitive cooperation in the salmon market. In connection with the inspection, the EU competition authorities has also requested for information from the shareholders in Scottish Sea Farms Ltd.[20]

---

[17]  *See*  https://www.undercurrentnews.com/2019/02/19/mowi-dutch-plant-also-raided-as-ec-confirms-probe-of-alleged-salmon-cartel/.

[18] *See* http://hugin.info/209/R/2239765/882920.pdf, at pg. 216.

[19] *See* https://www.griegseafood.no/inverstors/stock-exchange-filings/.
[20]  *See* https://www.leroyseafood.com/en/investor/.

39.     Also on February 19, 2019, SalMar issued the following report to the Oslo Stock Exchange:

> On 19th of February 2019 the European Commission Director General Competition performed an inspection at Scottish Sea Farms Ltd., in which SalMar ASA indirectly owns 50 per cent. SalMar is in constructive dialogue with the Commission in this regard.[21]

40.     The salmon market is susceptible to manipulation by the major salmon producers in Norway. As alleged further below, the industry is highly concentrated and the spot market for salmon in Oslo, Norway, is the most important benchmark for salmon prices around the globe.

41.     Salmon is sold on the spot market and through annual contracts. Only one percent (1%) of Norway's salmon production is sold on the spot market, but those spot prices set the baseline for longer term contract prices.[22]

42.     Since 2015, salmon buyers in Europe have complained that Norway's salmon producers, including Mowi, have been rigging the spot market by using subsidiary companies, including Mowi's Polish subsidiary, Morpol (a fish processor and distributor), to drive up the spot price. As the purchasing director of Graal, S.A. ("Graal") (a Polish salmon processor), Alina Piasecka, has explained, "We've seen examples of prices falling in the spot market, and exporters offering fish at increasingly lower prices." She continued, "Suddenly, 15 minutes later there are aren't fish available, and we find out that Morpol has purchased perhaps 60 truckloads." Graal's CEO, Boguslaw Kowalski, explained: "We are seeing that now and again

---

[21] See https://newsweb.oslobors.no/message/470051.

[22] *See* https://salmonbusiness.com/suempols-gm-does-not-believe-in-price-caps-in-the-second-half-of-2017/.

they take advantage of Morpol to buy at higher prices than that charged by the market, to hike up prices."[23]

43.     In 2017, Stale Hoyem, general manager of Suempol Norway, one of the biggest smoked salmon producers in Poland and Europe, complained that "companies in Norway buy small quantities of salmon to raise the price for the rest of the players." Hoyem continued, "One last thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there," he said, "suggesting this 'daily' practice is heavily influencing prices on the spot market."[24] Borge Prytz Larsen, purchasing director at Severnaya, which imports salmon into Russia, confirmed Hoyem's statement: "The big players buy fish, and they then use the price as indicators for other customers."[25]

44.     Defendants' pricing behavior changed at the start of the class period. Hoyem complains: "In the old days we could negotiate contracts. Producers looked at their cost and then they put on a surcharge of about NOK 1 (€0.11/$.13) to NOK 2 (€0.21/$.25) [per kilo]."[26]

---

[23]  *See*  https://www.intrafish.com/news/751597/marine-harvest-accused-of-manipulating-polish-salmon-market.

[24]  *See*  https://www.intrafish.com/news/1330269/norwegian-salmon-giants-accused-of-price-manipulation.

[25] *Id.*

[26] *Id*

45.      The foregoing are examples of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors and made for no other discernible reason than collusion.

46.      As a result of the conspiracy, Defendants' prices—and profits—for salmon have been increasing steadily since mid-2015, as Mowi itself illustrates in this chart:[27]



47.      Defendants frequently—and falsely—assert that cost increases justify their price increases, but their own data disproves that purported justification. For example, the following chart from Mowi indicates that the "cost in box" of producing salmon (per kilogram) has increased approximately half of one Euro (or less) during the conspiracy period, but prices have increased at a substantially faster rate:[28]

---

[27]      *See*      http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 32.
[28] *See* http://hugin.info/209/R/2177429/840178.pdf, at p. 246.



48.     According to Mowi's 4Q 2018 financial disclosures:

"2018 was a very good year for Mowi. Strong demand for salmon and high prices in all markets resulted in great earnings for the company. I am proud of all my colleagues who work hard to produce healthy and tasty seafood for consumers all over the world. They have all contributed to the strong results", says CEO Alf-Helge Aarskog.[29]

49.     Mowi's 2017 Annual Report confirms that since the uptick in salmon pricing

starting in 2015, its *operating profits* or "Operational EBIT"[30] (reported in Euros) has

---

[29] *See* http://mowicanadawest.ca/about/news-and-media/news_new2/strong-results-for-mowi-in-the-fourth-quarter-2018/. The complaint filed by Euclid Fish Company on April 23, 2019 cites https://www.mowi.com/about/news-and-media/news_new2/strong-results-for-mowi-in-the-fourth-quarter-2018/ for this press release, and the press release was no longer available via this URL as of April 24, 2019.

[30] "In accounting and finance, earnings before interest and taxes (EBIT) is a measure of a firm's profit that includes all incomes and expenses (operating and non-operating) except interest expenses and income tax expenses." *See* https://en.wikipedia.org/wiki/Earnings_before_interest_and_taxes.

substantially increased—from 346.8 million Euros in 2015, to 700.2 million Euros in 2016, and 792.1 million Euros in 2017.[31]

50.     Grieg similarly reports that its EBIT per kg gutted weight of fish (in Norwegian Kroner) has increased during the course of the conspiracy. According to Grieg's 2017 Annual Report, EBIT was 0.7 Kroners/kg in 2015, 18.0 Kroners/kg in 2016, and 14.4 Kroners/kg in 2017.[32] Grieg's 2018 Annual Report reports EBIT per kg (in Norwegian Kroner) of 14.72 for 2018.[33]

51.     Leroy has also experienced substantial increases in EBIT/kg (measured in Norwegian Kroner), increasing from 8.8 Kroners in 2015 to 18.9 Kroners in 2016, and 23.6 Kroners in 2017.[34] In 2018, Leroy's EBIT/kg was 19.6.[35]

52.     Similarly, SalMar's EBIT has increased substantially. In 2015, EBIT was 1404 million Norwegian Kroners. In 2016, EBIT was 2432 million Kroners. In 2017, EBIT was 3162 million Kroners.[36] In 2018, EBIT was 3460.8 million Kroners.[37]

---

[31] *See* http://hugin.info/209/R/2177429/840178.pdf, at p. 7.

[32] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 8.

[33]                                  *See*                          https://www.griegseafood.no/wp-content/uploads/2019/04/Grieg_A%CC%8Arsrapport_B%C3%B8rs_110419.pdf.

[34] *See* https://www.leroyseafood.com/en/investor/reports-and-webcast/annual-report-2017/to-the-table/#anchor-article-key-figures.

[35]     *See*     https://www.leroyseafood.com/globalassets/02-documents/english/reports/quarterly-reports/q4-2018-report.pdf.

53.     These price increases—and the Defendants' coordinated behavior that caused them—have come at the expense of Plaintiff and the Class, who have paid more for farm-raised salmon than they otherwise would have in the absence of collusion.

**B.      The United States Is A Substantial Market For Farm-Raised Salmon**

54.     The United States is the second largest global market for salmon behind only the EU, as Mowi reports in the graphic reflected below[38]:

## Global volume by market

| Markets | Estimated volumes | | Compared to Q4 2017 | | Est. volumes Q3 2018 | 12 month comparison | | |
|---|---|---|---|---|---|---|---|---|
| | Q4 2018 | Q4 2017 | Volume | % | | LTM | PTM | % |
| EU | 274 900 | 268 100 | 6 800 ↑ | 2.5% | 247 600 | 955 700 | 921 200 | 3.7% |
| Russia | 24 300 | 23 200 | 1 100 ↑ | 4.7% | 22 000 | 87 200 | 69 800 | 24.9% |
| Other Europe | 22 900 | 24 500 | -1 600 ↓ | -6.5% | 20 200 | 81 900 | 79 500 | 3.0% |
| **Total Europe** | 322 100 | 315 800 | 6 300 ↑ | 2.0% | 289 800 | 1 124 800 | 1 070 500 | 5.1% |
| USA | 107 700 | 103 000 | 4 700 ↑ | 4.6% | 102 200 | 427 900 | 397 700 | 7.6% |
| Brazil | 24 000 | 21 800 | 2 200 ↑ | 10.1% | 21 600 | 89 400 | 79 900 | 11.9% |
| Other Americas | 38 600 | 31 000 | 7 600 ↑ | 24.5% | 29 500 | 122 700 | 108 300 | 13.3% |
| **Total Americas** | 170 300 | 155 800 | 14 500 ↑ | 9.3% | 153 300 | 640 000 | 585 900 | 9.2% |
| China / Hong Kong | 25 800 | 27 300 | -1 500 ↓ | -5.5% | 24 700 | 101 700 | 86 000 | 18.3% |
| Japan | 16 300 | 15 900 | 400 ↓ | 2.5% | 12 800 | 53 900 | 57 700 | -6.6% |
| South Korea / Taiwan | 15 600 | 12 100 | 3 500 ↑ | 28.9% | 12 700 | 56 000 | 45 500 | 23.1% |
| Other Asia | 22 200 | 21 400 | 800 ↑ | 3.7% | 15 100 | 73 100 | 83 500 | -12.5% |
| **Total Asia** | 79 900 | 76 700 | 3 200 ↑ | 4.2% | 65 300 | 284 700 | 272 700 | 4.4% |
| All other markets | 32 900 | 30 400 | 2 500 ↑ | 8.2% | 29 400 | 116 000 | 108 800 | 6.6% |
| **Total** | 605 200 | 578 700 | 26 500 ↑ | 4.6% | 537 800 | 2 165 500 | 2 037 900 | 6.3% |
| Inflow to US from Europe | 25 700 | 25 100 | 600 ↑ | 2.4% | 22 000 | 93 800 | 95 300 | -1.6% |
| Inflow to EU from Chile | 8 400 | 12 200 | -3 800 ↓ | -31.1% | 7 600 | 37 700 | 38 300 | -1.6% |

Source: Kontali

- Strong demand globally
- Europe: Increased consumption at higher prices
- US: Convenient and consumer friendly pre-packed products drive growth
- Asia: Increased consumption. Lack of available large sized fish and certain trade restrictions temporarily impacted consumption in China/Hong Kong

Page 26          Source: Kontali
                 Note: Atlantic Salmon (GWT), LTM: Last Twelve Months, PTM: Previous Twelve Months"          MOWI

55.     A December 12, 2018 article from industry publication *Intrafish* further explains:

---

[36] *See* http://hugin.info/138695/R/2188425/846513.pdf.

[37] *See* http://hugin.info/138695/R/2234948/879657.pdf.

[38] *See* http://hugin.info/209/R/2234685/879436.pdf.

Salmon import volumes into the United States through October rose 10.5 percent, reaching 272,676 metric tons, according to new figures released by the National Marine Fisheries Service (NMFS).

The value of Atlantic salmon imports rose as well, by 9.5 percent, to reach $2.9 billion (€2.6 billion), up from $2.6 billion (€2.3 billion) during the same period last year.[39]

## C.  The Production Process For Farm-Raised Salmon

56.    Mowi diagrams the process for breeding and growing farm-raised salmon as follows:

The life cycle of salmon starts in freshwater and involves several stages before the young salmon (smolt) are ready for the sea.



**❶**

**EGGS**
Fertilised eggs are kept in incubation tanks in fresh water. There are approximately 5,000 eggs per litre. The eggs hatch into tiny fish (alevins), which have a yolk sac that provides nutrition until they are large enough to feed themselves.

**❷**

**PARR**
Once they weigh about six grams, the fish are moved to larger freshwater tanks or to an open net cage in a lake. The fish now develop into parr and once they weigh about 60–80 grams they're ready to move on to the smolt stage.

---

[39] *See* https://www.intrafish.com/marketplace/1654239/us-imports-of-fresh-salmon-fillets-spike.



**SMOLT**
This stage is when the fish undergo a physiological change that enables them to move from fresh water to seawater and become young adult salmon. The smolts are kept in net pens in the sea until they mature into adult salmon.

**HARVEST**
After just over a year in the sea the fish will have reached market weight (4.5 to 5.5kg) and are then harvested – in a variety of ways depending on the region.

*See* https://www.mowi.com/product/seafood-value-chain/ (visited prior to filing; webpage was no longer available via the URL as of April 24, 2019).

57.    A report commissioned by the European Union titled "Developing Innovative Market Orientated Prediction Toolbox to Strengthen the Economic Sustainability and Competitiveness of European Seafood on Local and Global markets" further depicts how salmon is processed:[40]



---

[40] *See* European Union's Horizon 2020 research and innovation program, "Deliverable No. 3.4 - Report on evaluation of industry dynamics opportunities and threats to industry".

**D.**      **The Structure And Characteristics Of The Market For Farm-Raised Salmon Supports The Existence Of A Conspiracy**

58.      The structure and other characteristics of the market for farm-raised salmon make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

**1.      Barriers To New Entry Are High**

59.      A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for farming salmon has high barriers to entry.

60.      Mowi's 2018 Investor's Handbook notes that there are relatively few locations in the world that provide the right mix of oceanic conditions for salmon farming and a political environment willing to allow the practice. Moreover, even if new entry could occur in the right geographic location, no additional salmon supply could be brought on line in the short run:

04      **Salmon Supply**

4.3 Few coastlines feasible for salmon farming



The main coastal areas adopted for salmon farming are depicted on the above map. The coastlines are within certain latitude bands on the Northern and Southern Hemisphere.

A key condition is a temperature range between above zero and 18-20ºC. The optimal temperature range for salmon is between 8 and 14ºC.

Salmon farming also requires a certain current to allow a flow of water through the farm. The current must however be below a certain level to allow the fish to move freely around in the sites. Such conditions are typically found in waters protected by archipelagos and fjords and rule out several coastlines.

Certain biological parameters are also required to allow efficient production. The biological conditions vary significantly within the adopted areas and are prohibitive for certain other areas.

Political willingness to permit salmon farming and to regulate the industry is also required. Licence systems have been adopted in all areas where salmon farming is carried out.

*See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 26. The complaint filed by Euclid Fish Company on April 23, 2019 cites to the webpage http://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf as the web address of this report, and as of April 24, 2019, the report was no longer available via that URL.

61.      Mowi explains that "[i]n all salmon producing regions, the relevant authorities have a licensing regime in place. In order to operate a salmon farm, a license is the key

prerequisite. The licenses constrain the maximum for each company and the industry as a whole."[41]

62.     Moreover, wild caught salmon cannot reasonably constrain prices for farm-raised salmon. National Public Radio summarized the breeding and cost advantages that farm-raised salmon have over wild caught salmon in an August 29, 2017 article:

### Why Are Atlantic Salmon Raised In The Pacific Northwest?

Atlantic salmon are not native to the Pacific Northwest. For years, they have been bred to become easier to farm — they're more "highly domesticated," according to the Washington Department of Fish and Wildlife. Most commercial fish farms raise Atlantic salmon.

The WDFW says Atlantic salmon is a "favored species" to farm in cold marine waters because the species grows quickly and consistently, is resistant to disease, and is something people like to eat. Farmed Atlantic salmon are more docile than wild fish.

Atlantic salmon also have been bred to more "efficiently turn feed into flesh," says Michael Rust, the science adviser for NOAA's office of aquaculture.

What used to cost several dollars per pound to grow, worldwide, now costs about $1.25, Rust says. That makes for higher profits.

In the U.S., Washington and Maine are the two largest Atlantic salmon producing states, but they're small beans compared to salmon farms in Canada, Norway and Chile.

Atlantic salmon today, Rust says, probably grow twice as fast as when aquaculture first started. [42]

63.     Wild caught salmon is generally twice as expensive per pound as farm-raised salmon.

---

[41]     *See*     http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 69.

[42]*See* https://www.npr.org/sections/thesalt/2017/08/29/546803147/why-are-atlantic-salmon-being-farmed-in-the-northwest.

## 2.      Farm-Raised Salmon Is A Commodity Product And Prices Are Correlated Across the Globe

64.     Mowi explains that salmon production is a "commodity" business: "As in most commodity industries, the producers of Atlantic salmon are experiencing large volatility in the price achieved for the product."[43] A report issued in 2018 by the European Union confirms this point: "[t]he output of most salmonid aquaculture, and Atlantic salmon in particular, is highly commoditised *i.e.* there is little differentiation between farms and competition is based purely on price. These products, mostly head-on gutted fresh fish, serve as raw material for further processing. In that situation, large enterprises which can reduce costs of production through economies of scale and offer the lowest price, have a competitive advantage."[44] Commodity products are fungible and consumers and other purchasers have a variety of supply options which makes raising prices by any one supplier difficult in the absence of a conspiracy.

65.     Further, according to Grieg, salmon prices are linked across the globe, and the Defendants and others closely follow these prices: "There are several reference prices for salmon available. In Norway, Fish Pool ASA provides historic price information as well as salmon derivative prices FCA Oslo. In the United States, Urner Barry provides reference prices for North American salmon in Seattle and Chilean salmon in Miami. ***Market prices are correlated across regions***."[45] (Emphasis added.)

---

[43]     *See*        http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 33.

[44] *See* European Union's Horizon 2020 research and innovation program, "Deliverable No. 3.4 - Report on evaluation of industry dynamics opportunities and threats to industry" at p. 4.

[45] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf at p. 40

66.     Mowi also recognizes that "price correlation across regional markets is generally strong for Atlantic salmon."[46] It further explains that arbitrage between regions is one of the factors constraining prices for Atlantic salmon.[47] Accordingly, price-fixing of salmon prices in one market will affect prices globally.

67.     In fact, Mowi tracks the correlation of salmon prices globally in the normal course of its business.[48] The company illustrates this graphically[49]:

---

[46]     *See*     http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 31.

[47] *Id.* at p. 32.

[48]     *See*     http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 32.

[49] *Id.* at 33.

05    **Salmon Markets**

5.6 Historic price development by local reference prices



68.    This point was also recognized in a 2016 report issued by the Oslo Fish Pool (a salmon financial contracts exchange) and DNB Foods & Seafood (which is part of Norway's largest financial services organization) titled "World market for salmon: pricing and currencies."[50] The report pointed out that Norwegian farmed salmon gate prices are "strongly linked" and that the collusion by Defendants on those Norwegian prices directly affected prices for farmed salmon raised elsewhere pursuant to the "law of one price".[51]

---

[50] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf.

[51] As explained below, Mowi operates salmon farms in Chile, as well as Norway.

28

69.     Indeed, the 2016 report noted as follows on page 7[52]:



70.     The 2016 report further elaborates on the economic principle of the "law of one price" as it relates to the farm-raised salmon market in the Unites States[53]:

---

[52] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf.

[53] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf.

# The law of one price
## *Norwegian and Chilean prices are linked*

- Price US = Norwegian farm gate price + air freight cost Atlantic
- Price US = Chilean farm gate price + air freight cost Americas
- Chilean farm gate price = Norwegian farm gate price + difference in freight cost Atlantic vs Americas



Must be measured in same currency. There can be price premiums/discount due to perceived or real differences in quality, consistency of supply, etc. There will be time lags in price adjustments due to logistics.

     **3.**     **Norwegian Companies Dominate The Production Of Farm-Raised Salmon And The Defendants Are The Largest Global Producers**

71.     A January 3, 2018 article in *salmonbusiness.com*—an industry publication—tracks Norway's dominance in the salmon industry:[54]

---

[54] *See* https://salmonbusiness.com/norways-market-share-shrinking/.



72.     Moreover, Norway's salmon industry is dominated by Defendants Mowi, Leroy, SalMar and Grieg. According to Mowi:[55]

---

[55]     *See*     http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 36.

## 06     Industry Structure

### 6.1 Top 5-10 players of farmed Atlantic salmon

| | Top 10 - Norway | H.Q. | Top 5 - United Kingdom | H.Q. | Top 5 - North America | H.Q. | Top 10 - Chile | H.Q. |
|---|---|---|---|---|---|---|---|---|
| 1 | Marine Harvest | 210 200 | Marine Harvest | 60 200 | Cooke Aquaculture | 57 000 | Salmones Multiexport | 58 700 |
| 2 | Salmar | 135 200 | Scottish Seafarms | 31 000 | Marine Harvest | 39 400 | Cermaq** | 54 000 |
| 3 | Lerøy Seafood | 132 000 | The Scottish Salmon Co. | 25 300 | Cermaq** | 21 000 | Marine Harvest | 44 900 |
| 4 | Cermaq** | 48 000 | Cooke Aquaculture | 20 000 | Northern Harvest | 12 500 | Empresas Aquachile | 43 300 |
| 5 | Grieg Seafood | 40 900 | Grieg Seafood | 12 100 | Grieg Seafood | 9 600 | Pesquera Los Fiordos | 41 000 |
| 6 | Nova Sea | 40 700 | | | | | Australis Seafood | 39 100 |
| 7 | Nordlaks | 40 000 | | | | | Camanchaca | 30 800 |
| 8 | Norway Royal Salmon | 31 900 | | | | | Blumar | 27 000 |
| 9 | Alsaker Fjordbruk | 25 000 | | | | | Nova Austral | 24 500 |
| 10 | Bremnes Seashore | 24 000 | | | | | Invermar | 23 200 |
| | Top 10 | 727 900 | Top 5 | 148 600 | Top 5 | 139 500 | Top 10 | 386 500 |
| | Total | 1 087 000 | Total | 156 900 | Total | 145 500 | Total | 521 200 |
| | Share of total | 67 % | Share of total | 95 % | Share of total | 96 % | Share of total | 74 % |

Note: All figures in tonnes GWT for 2017
* UK and North American industry are best described by top 5 producers.
** Cermaq is a fully owned subsidiary of Mitsubishi Corporation

The Marine Harvest Group represents the largest total production and produces around one fifth of the salmon produced in Norway, and about one third of the total produced in North America and the UK.

### 4.     Atlantic Salmon Production Is Highly Inelastic And The Product Is Perishable

73.    Mowi acknowledges that:

Due to the long production cycle and the short shelf life of the fresh product (about 3 weeks), the spot price clears on the basis of the overall price/quantity preference of customers. As salmon is perishable and marketed fresh, all production in one period has to be consumed in the same period. In the short term, the production level is difficult and expensive to adjust as the planning/production cycle is three years long. Therefore, the supplied quantity is very inelastic in the short term, while demand also shifts according to the season. This has a large effect on the price volatility in the market.[56]

74.    Accordingly, in the absence of coordinated conduct among producers, Defendants are price-takers. They are unable to reduce supply in the short term to raise prices unilaterally, and they must sell during a very short window while their product is fit for human consumption.

---

[56] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 32.

These market constraints make the market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated. *See* 2017 Mowi Annual Report, http://hugin.info/209/R/2177429/840178.pdf, at p. 235 ("Although the market price of salmon is established through supply and demand for the product, in the short term, salmon producers are expected to be price takers. The long production cycle and a short time window available for harvesting leave salmon farmers with limited flexibility to manage their short-term supply.").

### 5.   Industry Concentration Facilitates Collusion

75.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

76.    Here, there has been significant (and rapid) consolidation of salmon farming operations around the globe in recent years, as Mowi reports:[57]

---

[57] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 37.



The graph shows the number of players producing 80% of the farmed salmon and trout in each major producing country.

During the last decade the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue.

Historically, the salmon industry has been made up by many small firms. As illustrated above, this has been the case in Norway, and to some degree in Scotland and Chile.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All commercial and institutional purchasers in the United States and its territories that purchased farm-raised salmon and/or products derived therefrom, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of farm-raised salmon or products derived therefrom, from July 1, 2015 to the present. Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

78.     Plaintiff also brings this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

common law of unjust enrichment and the state antitrust, unfair competition, and consumer

protection laws of the states and territories listed below (the "Indirect Purchaser States")[58] on

behalf of the following class (the "Damages Class"):

> All commercial and institutional purchasers in the Indirect Purchaser States that
> purchased farm-raised salmon and/or products derived therefrom once or more
> other than directly from Defendants, entities owned or controlled by Defendants,
> or other producers of farm-raised salmon or products derived therefrom from July
> 1, 2015 to the present. Excluded from the Damages Class are the Court and its
> personnel, and any Defendants and their parent or subsidiary companies.

79.     The Nationwide Class and the Damages Class are referred to herein as the

"Classes."

80.     Plaintiff reserves the right to modify the class definitions at a later date, including

to add the first level of indirect purchasers.

81.     While Plaintiff does not know the exact number of the members of the Classes,

there are likely thousands of class members.

82.     Common questions of law and fact exist as to all members of the Classes. This is

particularly true given the nature of Defendants' conspiracy, which was generally applicable to

all the members of both Classes, thereby making appropriate relief with respect to the Classes as

a whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a)     Whether Defendants and their co-conspirators engaged in a combination
>
>         and conspiracy among themselves to fix, raise, maintain and/or stabilize

---

[58] The Indirect Purchaser States, for purposes of this complaint, are the states and territories for
which there are claims listed in the Causes of Action section below.

prices of farm-raised salmon and products derived therefrom in the United States;

(b)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of farm-raised salmon and products derived therefrom sold in the United States;

(c)   Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(d)   The identity of the participants of the alleged conspiracy;

(e)   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(f)   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(g)   Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(h)   Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(i)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(j)    The effect of the alleged conspiracy on the prices of farm-raised salmon and products derived therefrom sold in the United States during the Class Period;

(k)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for farm-raised salmon and products derived therefrom, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiff and the other members of the Classes;

(l)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

(m)    The appropriate class-wide measure of damages for the Damages Class.

83.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for farm-raised salmon and products derived therefrom purchased indirectly from Defendants and/or their co-conspirators. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

84.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes.

Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

85.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

86.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiff reserves the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

87.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

88.     Hundreds of millions of dollars of transactions in farm-raised salmon and products derived therefrom are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

89.     Defendants' manipulation of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

90.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for farm-raised salmon and products derived therefrom.

91.     Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of local television advertising, the prices of local television advertising would have been determined by a competitive, efficient market.

## PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

92.     Defendants' antitrust conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to the pricing of farm-raised salmon and products derived therefrom;

(b)     The prices of farm-raised salmon and products derived therefrom have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of farm-raised salmon and products derived therefrom have been deprived of the benefits of free and open competition; and

(d)     Purchasers of farm-raised salmon and products derived therefrom paid artificially inflated prices.

93. The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of farm-raised salmon and products derived therefrom.

94. The precise amount of the overcharge impacting the prices of farm-raised salmon and products derived therefrom paid by Plaintiff and the Damages Class can be measured and quantified using well-accepted models.

95. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for farm-raised salmon and products derived therefrom than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CAUSES OF ACTION

### COUNT I

### Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3)
### (Conspiracy in Restraint of Trade)

96. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

97. Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

98. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate

customers, rig bids, and raise, and/or maintain and fix prices for Farm-Raised Salmon, thereby creating anticompetitive effects.

99.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Farm-Raised Salmon.

100.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated class members in the Nationwide Class that purchased Farm-Raised Salmon have been harmed by being forced to pay inflated, supracompetitive prices for Farm-Raised Salmon.

101.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

102.    Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for Farm-Raised Salmon has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for Farm-Raised Salmon provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiff and members of the Nationwide Class who purchased Farm-Raised Salmon indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

103.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Farm-Raised Salmon

purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

104.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

105.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

**COUNT II**

**<u>Violation of State Antitrust Statutes</u>**
**<u>(on behalf of Plaintiff and the Damages Class)</u>**

106.    Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

107.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Farm-Raised Salmon in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

108.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for Farm-Raised Salmon and to allocate customers for Farm-Raised Salmon in the United States and its territories.

109.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Farm-Raised Salmon at certain levels, and

42

otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Farm-Raised Salmon provided in the United States; and (b)  participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

110.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of Farm-Raised Salmon. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for Farm-Raised Salmon than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

111.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and the members of the Damages Class.

112.    Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

113.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

114.    **Arizona:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401 *et seq*.  Defendants' conspiracies had the

following effects: (1) price competition for Farm-Raised Salmon was restrained, suppressed, and eliminated throughout Arizona; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401 *et seq*.

115.   **California:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq*.  During the Class Period, Defendants and their coconspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720.  Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of Farm-Raised Salmon at supracompetitive levels.  The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Farm-Raised Salmon.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of Farm-Raised Salmon.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for Farm-Raised Salmon has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Farm-Raised Salmon provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California and throughout the United

States; and (3) those who purchased Farm-Raised Salmon indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.  As a result of Defendants' violation of Cal. Bus. & Prof. Code §16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

116.   **District of Columbia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and purchased Farm-Raised Salmon in the District of Columbia, paid supracompetitive, artificially inflated prices for Farm-Raised Salmon, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501 *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501 *et seq*.

117.   **Iowa:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa.  During the Class Period, Defendants'

illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1 *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §553.1 *et seq*.

118.   **Kansas:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas.  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101 *et seq*.

119.   **Maine:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Maine; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine.  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

120.   **Michigan:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan.

46

During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771 *et seq*.

121.    **Minnesota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §325D.49 *et seq*.

122.    **Mississippi:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code §75-21-1 *et seq*.

123.    **Nebraska:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska.  During the Class

Period, Defendants' illegal conduct substantially affected Nebraska commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801 *et seq.*

124.    **Nevada:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010 *et seq*.

125.    **New Hampshire:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire.  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §356:1 *et seq*.

126.    **New Mexico:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Farm-Raised Salmon prices

were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

127.   **New York:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New York; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

128.   **North Carolina:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

129.   **North Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01 *et seq*.  Defendants' combinations or

conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01 *et seq*.

130.    **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout Oregon; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780 *et seq*.

131.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq.* The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island.  During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11 *et seq.*

132.     **South Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

133.     **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101 *et seq*.

134.     **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Utah; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

135.   **Vermont:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 V.S.A. § 2465 *et seq.*

136.   **West Virginia:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.   Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

137.   **Wisconsin:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01 *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period,

Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §133.01 *et seq*.

## COUNT III

### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff and the Damages Class)

138.    Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

139.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

140.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101 *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at noncompetitive and artificially inflated levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.  The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.  Defendants have

engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

141.   **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq*.  During the Class Period, Defendants manufactured, marketed, sold, or distributed Farm-Raised Salmon in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200 *et seq*., by engaging in the acts and practices specified above.  This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200.   The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200 *et seq*., including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720 *et seq*., set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720 *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Farm-Raised Salmon in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. &

Prof. Code §17200 *et seq*. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Damages Class to pay supracompetitive and artificially inflated prices for Farm-Raised Salmon. Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200 *et seq*. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

142. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Florida; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal

conduct substantially affected Florida commerce and consumers. Accordingly, plaintiff and members of the Damages Class seek all relief available under Fla. Stat. §501.201 *et seq*.

143.   **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff as a purchaser of the Defendants' goods, and which caused Plaintiff to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff and the members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and Farm-Raised Salmon purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute and as equity demands.

144.   **Missouri:** Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Defendants engaged in the conduct described in this Class Action Complaint in connection with the sale of products containing Farm-Raised Salmon in Missouri. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers. Defendants agreed to, and in fact did, fix, control, and maintain at artificial and non-competitive levels, the price at which Farm-Raised Salmon was

sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiff and the members of the Damages Class. Defendants concealed, suppressed, and failed to disclose material facts to Plaintiff and the members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. The concealed, suppressed, and omitted facts would have been important to Plaintiff and the members of the Damages Class as they related to the cost of products containing Farm-Raised Salmon. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for products containing Farm-Raised Salmon. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and the members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and the members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this Count.

145. **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and Farm-Raised Salmon purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

146. **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold Farm-Raised Salmon in New Hampshire and deceived Plaintiff and Class Members in New Hampshire into believing that the Farm-Raised Salmon were competitively priced. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased the Farm-Raised Salmon in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased Farm-Raised Salmon in New Hampshire paid supracompetitive,

artificially inflated prices for Farm-Raised Salmon in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and Farm-Raised Salmon purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

147. **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiff and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing Farm-Raised Salmon because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Farm-Raised Salmon, including their illegal conspiracy to secretly fix the price of Farm-Raised Salmon at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages

59

Class. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout New Mexico; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Farm-Raised Salmon. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

148. **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their coconspirators made public statements about the prices of Farm-Raised Salmon that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Farm-Raised Salmon; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New

York, New York class members who indirectly purchased Farm-Raised Salmon were misled to believe that they were paying a fair price for Farm-Raised Salmon or the price increases for Farm-Raised Salmon were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing Farm-Raised Salmon would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing Farm-Raised Salmon would have a broad impact, causing commercial and institutional indirect food preparer class members who indirectly purchased Farm-Raised Salmon to be injured by paying more for Farm-Raised Salmon than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of customers and commercial and institutional indirect food preparers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New York; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Farm-Raised Salmon. During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they

dominated and controlled, manufactured, sold and/or distributed Farm-Raised Salmon in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

149.   **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.   Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.   Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout North Carolina; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid

supracompetitive, artificially inflated prices for Farm-Raised Salmon. During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Farm-Raised Salmon in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

150. **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Farm-Raised Salmon was restrained, suppressed, and eliminated throughout North Dakota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class

Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and Farm-Raised Salmon purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

151.    **Rhode Island:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws § 6-13.1-1, et seq.) Members of the Damages Class purchased Farm-Raised Salmon for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that

duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Farm-Raised Salmon. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, including commercial and institutional indirect food preparers that serve as a conduit to consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Farm-Raised Salmon they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

152.    **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout South Carolina; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

153.    **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Farm-Raised Salmon was restrained, suppressed, and

eliminated throughout South Dakota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased Farm-Raised Salmon in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Farm-Raised Salmon they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

154. **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for

Farm-Raised Salmon. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, likely misled all commercial and institutional indirect food preparer purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

155.    **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price

competition for the Farm-Raised Salmon was restrained, suppressed, and eliminated throughout Wisconsin; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of Farm-Raised Salmon. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of Farm-Raised Salmon at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Farm-Raised Salmon they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

## COUNT IV

### Unjust Enrichment[59]
### (on behalf of Plaintiff and the Damages Class)

156.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

---

[59] Unjust enrichment claims are alleged herein under the laws of the states for which claims are alleged in Counts Two and Three above.

157.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

158.    Defendants have unlawfully benefited from their sales of Farm-Raised Salmon because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held commercial and institutional indirect food preparers, which purchased Farm-Raised Salmon at prices that were more than they would have been but for Defendants' unlawful actions.

159.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

160.    Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

161.    Defendants have been enriched by revenue resulting from unlawful overcharges for Farm-Raised Salmon while Plaintiff and members of the Damages Class has been impoverished by the overcharges they paid for Farm-Raised Salmon imposed through Defendants' unlawful conduct.  Defendants' enrichment and the impoverishment of Plaintiff and members of the Damages Class are connected.

162.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

163.    Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

164.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Farm-Raised Salmon.

165.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Farm-Raised Salmon are ascertainable by review of sales records.

166.    It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of Farm-Raised Salmon.

167.    It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Farm-Raised Salmon, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

168.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Farm-Raised Salmon is a direct and proximate result of Defendants' unlawful practices.

169.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

170.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for Farm-Raised Salmon derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

171.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as Farm-Raised Salmon prices remain inflated above pre-conspiracy levels.

172.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of Farm-Raised Salmon.

173.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Farm-Raised Salmon by Plaintiff and the Damages Class. Plaintiff and the Damages Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment for the following relief:

174.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

175.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an

unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively (d) acts of unjust enrichment by Defendants as set forth herein.

176.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

177.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

178.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis;

179.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

180.    Plaintiff and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

181.    Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

182.    Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: May 9, 2019                    Respectfully submitted,

                                              /s/ Taylor A. Asen, Esq.
                                              Taylor A. Asen, Esq.
                                              Berman & Simmons, P.A.
                                              P.O. Box 961
                                              Lewiston, ME  04243-0961
                                              (207) 784-3576
                                              tasen@bermansimmons.com

                                            Jonathan W. Cuneo (to apply pro hac vice)
                                            Daniel Cohen (to apply pro hac vice)
                                            Jennifer Kelly (to apply pro hac vice)
                                            Blaine Finley (to apply pro hac vice)
                                            **CUNEO GILBERT & LADUCA, LLP**
                                            4725 Wisconsin Ave. NW
                                            Suite 200
                                            Washington, DC 20016
                                            Telephone:  (202) 789-3960
                                            jonc@cuneolaw.com
                                            danielc@cuneolaw.com
                                            jkelly@cuneolaw.com
                                            bfinley@cuneolaw.com

                                            *Counsel for Plaintiff and the Proposed Classes*

1585944.doc